IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br>LISA ANN VANDENBERG,<br><br>Debtor. | Chapter 13 Proceedings<br>Case No. 09-bk-23387<br><br>MEMORANDUM DECISION DENYING STAY PENDING APPEAL |

## I. PRELIMINARY STATEMENT

On May 11, 2012, Lisa Vandenberg, the Debtor in this Chapter 13 proceeding, filed a motion with this Court, requesting the Court stay its April 2, 2012 Order denying confirmation of Debtor's proposed Chapter 13 Plan while the Debtor pursued its rights and remedies on appeal. On May 16, 2012, Russell Brown, the Chapter 13 Trustee, filed a response entitled "Trustee's Objection to Motion for Stay Pending Appeal." On May 17, 2012, the Court held oral argument on the Debtor's Motion, and then took the matter under advisement. For the reasons set forth hereinafter, the Court will deny the Debtor's Motion. The Court has jurisdiction over this matter, and this is a core proceeding. 28 U.S.C. §§1334 and 157. To the extent necessary, the Court has set forth its findings of fact and conclusions of law. Fed.R.Bankr.P. 7052.

## II. DISCUSSION

### A. The Court's Decision on the Record

On November 30, 2011, this Court conducted an evidentiary hearing on whether

1

Case 2:09-bk-23387-PS    Doc 155   Filed 05/21/12   Entered 05/21/12 15:21:55   Desc
Main Document    Page 1 of 15

the Debtor's plan of reorganization should be confirmed, taking the matter under advisement at the conclusion of the hearing. On March 28, 2012, the Court placed extensive findings of fact and conclusions of law on the record as to why it was denying confirmation of the Debtor's plan.[1] The Court has reviewed its bench notes to provide further information on the Court's factual and legal analysis in this Order.[2]

The Debtor is a Commissioner of the Maricopa County Superior Court, in Phoenix, Arizona, currently serving in the criminal division of that Court, and she anticipates being able to hold that position indefinitely. The parties agreed that the Debtor's current monthly income alone exceeded the median income for a household of the same size in Arizona.[3] At the time of the confirmation hearing, the Debtor's spouse was an undergraduate at Arizona State University, and the Debtor was providing the funding for his education. The Debtor's spouse intended to apply for a graduate program to obtain a Master in Fine Arts' degree, and was receiving no income in November 2011.[4]

The Debtor has been repaying her student loans, and she provided, in her chapter

---

**1.** Counsel for the Debtor and the Chapter 13 Trustee have ordered transcripts of the Court's decision, but the transcript has not yet been placed on the docket.

**2.** The Court is only providing a summary of that part of its decision on the record that may be relevant to the issues presented in the Motion for Stay Pending Appeal. However, that decision is incorporated herein.

**3.** At the time of the hearing, the Debtor received in gross compensation in excess of $125,000 per year as a Court Commissioner. The household consists of just the Debtor and her spouse.

**4.** At oral argument on May 17, 2012, the Court learned that the Debtor's spouse was not admitted to any graduate program to obtain a Master in Fine Arts. Counsel believed that the Debtor's spouse was applying for some type of certificate program to teach and stated that the spouse could be earning income at some point. The Debtor intends to update her Schedules I and J concerning their monthly income and expenses. Debtor's counsel also stated that the Debtor's spouse would shortly have to start repaying student loans, but the Debtor provided no information as to her spouse's student loans, stating at the November 2011 confirmation hearing that she "was putting [her husband] through school."

2

13 plan, for direct payment of her student loans at the rate of $830 per month. The Chapter 13 Trustee challenged the propriety of making those direct payments. Specifically, the Trustee stated that the payments of $830 per month allowed for the Debtor to repay her student loans **in full** to the detriment of her other general unsecured creditors. The Trustee stated that the Debtor's proposed plan provided for the payment of the aggregate amount of only $569.44 to all of the other unsecured creditors. The Court agreed with the Trustee's position, stating in its decision on the record of March 28, 2012, that the Debtor unfairly discriminated against the other general unsecured creditors, requiring that confirmation of the Debtor's plan be denied.

The Debtor also owns a vacant lot in Scottsdale, Arizona, which hasdramatically declined in value during the course of her Chapter 13 proceedings. M&I Marshall & Ilsley Bank ("M&I Bank"), filed a secured proof of claim in the Debtor's case, stating that it was owed in excess of $233,000. Initially the Debtor listed the value of the lot at $109,500. The Bank believed that the lot had an initial value of $116,000 at the time of the filing of the Debtor's petition, but that the value had declined to $44,000 as of August 2011when the Bank filed its Motion for Adequate Protection. The Debtor testified at the confirmation hearing that she believed that the value had further declined to just $24,000 or $25,000. The Debtor proposed to retain the Scottsdale lot, a non-exempt asset, and continue to pay the secured creditor's claim. The Debtor testified that she wished to retain the lot because she intended, some day, to build a home and retire on the lot, or she might use the lot, some day, for "urban farming."[5] In the March 28, 2012 decision, the Court concluded that the Debtor carried the burden of proof on whether her plan should be confirmed. The Court concluded that the Debtor's retention of the Scottsdale lot was not done in good faith, that the automatic stay would be vacated immediately,

---

**5.** The Debtor was unclear as to why this lot was necessary for her retirement. As a Commissioner, when she retires, she will receive a pension provided by the State of Arizona, and she has also been reducing her gross income by placing funds in a separate retirement account, similar to a 401(k), on a pre-tax basis. The Debtor is also in her mid-to-late 30's, so the Debtor was vague as to how she intended to use the lot for urban farming at some point in the future.

3

1 and that the Debtor had to surrender the lot to M&I Bank.

2 Although the Debtor requested an expedited hearing on the Motion for Stay
3 Pending Appeal, the Court's decision denying confirmation was placed on the record on March
4 28, 2012, and the Court executed a minute entry order denying confirmation of the Debtor's plan
5 on April 2, 2012. Debtor's counsel seemed to indicate, at the hearing on May 17, 2012, that the
6 Court's refusal to allow (1) direct monthly payments on the student loans, and (2) mortgage
7 payments on the Scottsdale lot had prompted the request for the stay.

## B. Standards for a Stay Pending Appeal

Federal courts have the inherent power to stay judgments and orders pending appeal. In re Wymer, 5 B.R. 802, 804 (9th Cir. BAP 1980). "[A] bankruptcy judge may suspend or order the continuation of other proceedings . . . .during the pendency of an appeal on such terms as will protect the rights of all parties in interest." Fed. R. Bankr. P. 8005.

The Ninth Circuit continues to adhere to its sliding-scale balancing of four traditional factors:

(1) whether the applicant for the stay has made a strong showing that she is likely to succeed on the merits;

(2) whether the applicant will be irreparably injured absent a stay;

(3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and

(4) where the public interest lies.

In re Red Mountain Machinery Co., 451 B.R. 897, 899 (Bankr. D. Ariz. 2011) (*citing* Leiva–Perez v.Holder, 640 F.3d 962, 964 (9th Cir. 2011). Under the sliding-scale approach, the debtor is required to make a stronger showing on the likelihood of success on the merits of the appeal, if she makes a weaker showing of irreparable injury. Mountain Machinery, 451 B.R. at 899 (citations omitted).

4

1. Likelihood of Success on the Merits

In the Motion and at oral argument on May 17, 2012, the Debtor argued that as a result of a recent ruling by the Ninth Circuit Bankruptcy Appellate Panel in the decision of Drummond v. Welsh (In re Welsh), 465 B.R. 843 (9th Cir. BAP 2012), the Debtor estimated her chance on the merits to be increased to at least 50 percent or better.[6] The Court disagrees with the Debtor's assessment.

First, the United States District Court is not bound by a Bankruptcy Appellate Panel decision, although it may certainly consider the Panel's analysis on bankruptcy issues. Bank of Maui v. Estate Analysis, Inc., 904 F. 2d 470 (9th Cir. 1990). In fact, unless an appellate decision arises from the District of Arizona, this Court is not bound by an intermediate appellate decision from a district court or the Bankruptcy Appellate Panel. Id. Thus, although the Court will discuss Welsh, it is not bound by the decision. Finally, the Welsh decision reflects the view of just two judges, with a strong dissenting opinion. Given these preliminary issues, the Debtor's objective ability to succeed on the merits is much less than 50 percent.

Turning to the recent authority cited by the Debtor, the Court concludes that the facts of this case do not support a similar ruling. In Welsh, the Panel first determined that the debtor carried the burden of proof as to each requirement under 11 U.S.C. § 1325, citing to Meyer v. Hill (In re Hill), 265 B.R. 548, 552 (9th Cir. BAP 2001). Id. at 847. The Chapter 13 Trustee had objected to confirmation of the Plan, so the debtor, in Welsh, was also required to meet the relevant provisions set forth under Section 1325(b).

Section 1325(b)(1)(B) states that the court may not confirm the debtor's plan unless "all of the debtor's projected disposable income to be received . . . . will be applied to make payments to unsecured creditors under the plan." For purposes of said Subsection, "disposable income" is defined as "current monthly income received by the debtor . . .less

---

**6.** Counsel for the Debtor stated that trial courts are generally reversed on appeal only 15 percent of the time. Counsel did not provide any documentation to support this position, although this judge's reversal record is less than 15 percent.

5

Case 2:09-bk-23387-PS    Doc 155    Filed 05/21/12    Entered 05/21/12 15:21:55    Desc
Main Document    Page 5 of 15

amounts reasonably necessary to be expended – (A)(i) for the maintenance or support of the debtor or a dependent of the debtor. . ..." 11 U.S.C. §1325(b)(2).  In turn, "amounts reasonably necessary to be expended" shall be determined pursuant to Subparagraphs (A) and (B) of 11 U.S.C.§707(b)(2), if the debtor receives an above median income, for households of the same size, as determined by the state where the debtor resides.  The <u>Welsh</u> Panel concluded that the debtor received more than the above median income for a household of the same size in the State of Montana, where the debtor resided.

Analyzing each applicable Subsection under Section 707(b)(2)(A) and (B), the <u>Welsh</u> Panel majority came to the ultimate determination that all of the secured debt payments on six vehicles (including the All Terrain Vehicles [or ATV's]), proposed by the debtor in her plan, were a proper expense deduction, irrespective of the debtor's reasonable need for the vehicles.[7]  Such a determination led the majority to conclude that the debtor's plan was properly confirmed by the bankruptcy court and that the debtor could retain all six vehicles and continue to make the secured debt payments on the vehicles.  These secured debt payments, of course, ultimately affected the amount of disposable income remaining to pay unsecured creditors who received de minimus payments under the debtor's confirmed plan.  <u>Id</u>. at 850.

In supporting its decision, the Panel also distinguished its prior decisions of <u>Am. Express Bank, FSB v. Smith (In re Smith)</u>, 418 B.R. 359 (9th Cir. BAP 2009), and <u>Yarnall v. Martinez (In re Martinez)</u>, 418 B.R. 347 (9th Cir. BAP 2009), stating that the debtors in each prior case had intended to surrender the property subject to the liens or were going to strip off the lien on the real property, effectively transforming the secured debt into unsecured debt.[8]

---

**7.** The debtor used one of the ATV's to plow her driveway, because her $400,000 home was at the top of a ridge; and both ATV's were utilized for recreational use on nearby Nature Conservancy land. Id. at 846.  Although it was unclear as to the value of each of the six vehicles, it appears that they were "over-encumbered;" that is, the secured debt on the vehicles exceeded their then current value. <u>Id</u>. at 845-846, and Note 3.

**8.** The <u>Welsh</u> Panel stated that neither party had cited it to its prior precedent which had disallowed the payment of secured debt, which precedent appeared contrary to the decision in

6

Case 2:09-bk-23387-PS    Doc 155    Filed 05/21/12    Entered 05/21/12 15:21:55    Desc
Main Document    Page 6 of 15

Because the debtors had decided not to pay the secured debt, for a variety of reasons, the debtors could **not** deduct the secured payments that they would **not** be paying in computing the amount of disposable income available to pay the unsecured creditors. Id. at 850. Then in a leap of logic, the Welsh majority stated:

> [The Smith and Martinez] cases do not mean that, where the debtor retains property securing debt, does not strip the security interest, and deducts the secured debt payment as an expense in applying the means test, the bankruptcy court must determine whether the unencumbered property the debtors intend to retain is necessary or unnecessary.

Id. However, the Welsh majority also stated that both Panels in Smith and Martinez required the bankruptcy court, under Section 1325(b)(2) "to look at the necessity of the expense as determined by the debtor on a real-time, forward-looking basis," and to do a "static, backward-looking inquiry" under Section 1325(b)(3), which incorporates Section 707(b). Id. citing to Martinez, 418 B.R. at 356; *accord* Smith, 418 B.R. at 369. Apparently the Smith and Martinez Panels concluded that since the debtors made the decision as to which assets should be retained and which assets should be surrendered, the debtors should be held to the consequences of those decisions. But if the debtors choose to retain an asset which has an expense associated with it, should the debtors at least not make some showing of the necessity of the expense from their standpoint? The Welsh majority decision does not describe any type of showing made by the debtors.

Recent appellate decisions question whether a statute should be read in a manner that creates an absurd result. *See,* for instance, Hamilton v. Lanning, 130 S.Ct. 2464, 177 L.Ed.2d 23 (2010). To allow a debtor to retain six over-encumbered vehicles, two of which were recreational vehicles, based upon a technical reading of Section 1325 turns the Congressional intent concerning the enactment of the Bankruptcy Abuse Prevention and Consumer Protection

---

Welsh. Id. at 850.

7

Act of 2005 ("BAPCPA") on its proverbial head. Indeed, in the decision of In re Pak, 378 B.R. 257, 265 (9th Cir. BAP 2007), the Ninth Circuit Bankruptcy Panel stated that the legislative history for BAPCPA reflected a Congressional intent hat debtors make a good faith effort to repay as much as they could afford. In the decision of In re Ransom, the Panel stated "There is a point of degree in which a debtor's proposed Chapter 13 plan can move into the realm of overreaching that is lacking in good faith. . ." In re Ransom, 2007 WL 4625248 *7 (9th Cir. BAP 2007), citing Pak at 273. Based upon these authorities, this Court concludes that the decision in Welsh was wrongly decided.

Even if the debtors are allowed to determine what assets should be retained by them and what assets should be surrendered, with **no** showing of any necessity by them to meet the mechanical test under Section 1325(b), they still must meet the separate requirement of Section 1325(a)(3) that their plan has been proposed in good faith. The majority in Welsh discusses the three approaches by the courts to determine whether the debtor has proposed her plan in good faith. One approach is to hold that technical compliance with Section 1325(b) creates a "safe harbor"and precludes a finding of bad faith; another approach, at the other end of the spectrum, requires that the debtors "contribute all that they can afford to pay creditors under a plan, regardless of what [Section] 1325(b) might otherwise dictate;" and the third, intermediate approach states that "the sufficiency of the assets devoted to the plan is not a basis for a finding of lack of good faith . . ., unless there is a showing of some sort of manipulation, subterfuge or unfair exploitation of the Code by the debtor." Id. at 854. However, the majority then determines that "Congress has made the policy choice that payments on secured claims are 'amounts reasonably necessary to be expended for the debtor's . . maintenance or support.'" Id. at 855. Thus, compliance with the applicable Sections 1325(b)(3) and 707(b)(2) leads to a finding of good faith under Section 1325(a)(3). To do otherwise, the majority opines, "would second-guess the Congressional policy choice about what expenses are reasonably necessary for a debtor's maintenance and support." Id.

8

The dissent, in Welsh, correctly states that a totality of the circumstances test required in the Ninth Circuit to determine whether the debtor's plan has been proposed in good faith requires an "unfettered" review.[9] Id. at 859. As to the payments made to secured creditors, the dissent states that the fact that the "current payments are deducted in a [Section] 707(b)(2)/[Section] 1325(b) means test analysis is not reason enough for the bankruptcy court to decline to exercise its conscience in deciding whether, in proposing large plan payments on unnecessary secured debts, the plan treats [d]ebtors' other creditors equitably." Id. at 861. The dissent then states

> Here, Debtors should reasonably be expected to propose a chapter 13 plan that retains, and pays the debts secured by, their home and necessary vehicles. But there is nothing in the record to demonstrate that Debtors needed, or that they should pay the debts for, a car their nonresident, physician-daughter drives, two four-wheeler ATV's, or an Airstream travel trailer. The bankruptcy court erred in approving a plan as "good faith" that allows these high-income Debtors to pay secured creditors to retain unnecessary items.[10]

Id. The dissent reasons notes that the "means test calculations incorporated in Section 1325(b) and the good faith requirement under Section 1325(a)(3) are distinct plan confirmation requirements." Id. Although a debtor may navigate the means test concerning the retention of luxury items, that factor alone does not warrant confirmation of the debtor's plan on the basis of

---

**9.** The "totality of the circumstances" test in determining whether the debtor has proposed a plan in good faith takes into consideration (1) whether the debtor misrepresented facts, unfairly manipulated the Bankruptcy Code, or otherwise proposed the plan in an inequitable manner; (2) the history of the debtor's filings and dismissals; (3) whether the debtor intended only to defeat state court litigation; and (4) whether the debtor's behavior was egregious. Leavett v. Soto (In re Leavitt), 171 F.3d 1219, 1224-25 (9th Cir. 1999)(actually focusing on whether the debtor had filed his chapter 13 petition in good faith); Goeb v. Held (In re Goeb), 675 F.2d 1386, 1390 (9th Cir. 1982), relying on whether the debtors "acted equitably in proposing their Chapter 13 plan," which required the bankruptcy court to "inquire whether the debtor . . .misrepresented facts in his plan, unfairly manipulated the Bankruptcy Code, or otherwise proposed his Chapter 13 plan in an inequitable manner."

**10.** In a footnote, the dissent notes that the debtors had total monthly income exceeding $9,200.

9

good faith under Section 1325(a)(3).

In this case, the Court will follow the analysis proposed by the dissent. In its decision on the record of March 28, 2012, the Court analyzed the payment of the student loans and the retention of the Scottsdale lot, and the payment of the secured debt with respect to that lot, on the basis of whether the Debtor was proposing her plan in good faith.

This Court stated that it must make a determination of whether the Debtor's plan was proposed in good faith. In re Martin, 373 B.R. 731 (Bankr. D. Utah 2007). Section 1325(a)(3) has an independent requirement that the Debtor's plan be filed in good faith, and under Section 1325(a)(7), the Chapter 13 petition must be filed in good faith. The Court's requirement to analyze the Debtor's good faith is independent of whether the issue is raised by the parties.[11] In re Harris, 132 B.R. 166 (Bankr. S.D. Iowa 1989). The Court may make a finding that the Chapter 13 petition was not filed in good faith without finding that the Debtor has acted dishonestly. In re Lavilla, 425 B.R. 572, 576 (Bankr. E.D. Cal. 2010), citing to Guastella v. Hampton (In re Guastella), 341 B.R. 908 (9th Cir. BAP 2006). This Court concluded that based upon the evidence presented, the Debtor's payment of a de minimus amount to her unsecured creditors as a result of her direct payment on her student loans and her retention of her Scottsdale lot reflected a lack of good faith on her part. The Debtor was insisting on discriminatory treatment of her unsecured creditors without meeting the appropriate Ninth Circuit test for such discrimination, and she was retaining a vacant lot in Scottsdale on some amorphous concept that she would build a home on it some day, in retirement, or she would use the lot to engage in

---

**11.** At oral argument on May 17, 2012, Debtor's counsel argued that the Chapter 13 Trustee had not listed the Debtor's good faith as an issue in the joint pretrial statement. However, the Trustee did raise the issue in his pleadings and did argue the issue at the November 30, 2011 hearing on confirmation. In any event, the Court, in its decision on record, independently reviewed the Debtor's good faith in proposing her plan as it is required to do under Section 1325(a)(3).

10

urban farming.[12]

This Court also entered extensive findings of fact and conclusions of law, in its decision on the record on March 28, 2012, as to whether the Debtor could pay her student loans directly, in full, yet pay her other general unsecured creditors, of the same priority, a de minimus amount. The Debtor has raised the direct payment of her student loans as a separate issue on which she may succeed on the merits. The Debtor believes the student loan issue is one of first impression. It is not.

> 11 U.S.C. §1322(b)(1) provides, in relevant part:
> [T]he plan may—designate a class or classes of unsecured claims, as provided in section 1122 of this title, but may not discriminate unfairly against any class so designated. . .

In turn, Section 1122, states, in pertinent part:

> (a) . . . a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interest of such class.[13]

Case law interpreting these provisions of the Bankruptcy Code states that unfair discriminatory treatment of unsecured claims is disallowed. Although claims of the same priority may be classed separately and paid a different percentage amount of their allowed claims, there should be a basis for the discrimination. Case law has developed a series of factors for courts to consider in determining whether the discrimination is unfair. In re Labib-Kiyarash, 271 B.R. 189 (9th Cir. BAP 1994); In re Sperna, 173 B.R. 654 (9th Cir. BAP 1994); In re Wolff, 22 B.R.

---

**12.** In finding that the Debtor's plan was not filed in good faith under Section 1325(a)(3), the Court relied on a series of cases focusing on the retention of a boat and other luxury items by debtors. See Matter of Love, 957 F.2d 1350 (7th Cir. 1992); In re Martin, 373 B.R. 731 (Bankr. D. Utah 2007); In re Cordes, 147 B.R. 498 (Bankr. D.Minn. 1992);

**13.** Subsection (b) concerning the placement of general unsecured claims in a separate class for "administrative convenience" is not applicable to this matter.

11

510 (9th Cir. BAP 1982). Indeed throughout these proceedings, the Debtor stated that she would meet the factors set forth in the decision of In re Wolff , so that she could discriminate against her other general unsecured creditors, paying them a de minimus amount, while paying her student loans in full. Thus, it is unclear why the Debtor now raises the so-called lack of authority as a basis for her Motion for a Stay.

Turning to the Wolff factors, the Debtor failed to meet her burden of proof to discriminate against her other general unsecured creditors.

1. The discrimination does not have a reasonable basis. In this matter, the Debtor supports her discrimination by stating that she has made a "lifestyle choice" to pay her student loans in full, with a de minimus payment to creditors of the same priority. From this Court's standpoint, a "lifestyle choice" is not a basis to discriminate, and the Debtor has cited this Court to no authority which permits discrimination on such a basis..

2. The Debtor is able to carry out the plan without discrimination. The Court has found that the Debtor may place all of her general unsecured claims, including her student loans, in one class, and pay a percentage of the claims of that class over the duration of her plan. Although the Debtor will not pay her student loans in full, over the duration of her plan, when she receives her discharge, she may resume payments on her student loans which are nondischargeable debts.[14] The Debtor now complains that her student loans will be placed in a state of default; however, the Debtor has not balanced said effect with her ability, after she has made all of her payments under her plan and received a discharge, to devote all of her future disposable income to the payment of said loans. The Debtor never presented any evidence that the default of her student loans would somehow justify the discrimination and that she could not

---

**14.** Under 11 U.S.C. §523(a)(8), her student loans are nondischargeable. Under 11 U.S.C. §1328(a)(2), student loans survive a debtor's discharge and must be paid in full. However, the benefit to the Debtor will be that once she receives her discharge, the other unsecured claimants will no longer be able to pursue her for collection, and she will have all of her disposable income available to pay her student loans on a going-forward basis.

12

carry out her plan without the discrimination. The Court cannot now speculate as to the effect.

   3. The discrimination is not proposed in good faith. The Debtor only focused on her "lifestyle choice" to pay her student loans in full, and pay her other unsecured creditors a de minimus amount. The Debtor has not proceeded in good faith. There is no evidence in the record which reflects a basis for the discrimination.

   4. The degree of discrimination is not directly related to the basis or rationale for the discrimination. The degree of discrimination, in this matter, is nearly complete. The Debtor proposes to pay 100 percent of her student loans under her plan, and pay roughly 2 percent of her other general unsecured claims. The Debtor proposes to pay $830 per month directly on her student loans, so that said creditors may be paid in full during the course of her plan, yet pay all of her other general unsecured creditors the aggregate amount of $569.44. The Debtor testified that her student loans were in the aggregate amount of roughly $61,000 in November 2011, and the Trustee stated that the amount of $33,654.35 was listed on the claims register as representing the amount of the other general unsecured claims. The Trustee estimated that if the Debtor utilized the $830 per month payment on the student loans for the benefit of all of her unsecured creditors, she could make a substantial payment to all of her general unsecured creditors, including the student loans, during the course of her plan. The basis or rationale for the discrimination is a notion that the Debtor may make a lifestyle choice to prefer her student loans over her other general unsecured creditors. There is no basis for that discrimination, when she can make substantial payments to all of her unsecured creditors, over the duration of her plan, if she placed them in the same class and paid them *pro rata*.

   Since the Debtor failed to meet her burden of proof on the <u>Wolff</u> factors, the Debtor has failed to show any likelihood of success on the merits on appeal concerning her payment of student loans in full to the detriment of her other general unsecured creditors.

   For the foregoing reasons, the Court concludes that the Debtor has not made the requisite showing of likelihood of success on the merits to warrant a stay pending appeal.

13

## 2. Whether the Applicant will be Irreparably Injured by the Stay

The Debtor's Motion states that the Debtor will suffer irreparable injury if a stay is not issued because (1) if the Scottsdale lot is surrendered, the Debtor will not be able to retain the lot in the future and it will be sold at foreclosure, and (2) if she is unable to make direct payments on the student loans, they will be placed in default, and she will have to "deal with defaulted student loans once this proceeding is completed." As to the loss of the lot, the Debtor conceded, at trial, that M & I Bank, the secured creditor, had advised the Debtor that it no longer wanted the Scottsdale lot, and did not intend to foreclose on it. Moreover, and probably related to why the Bank no longer wants the lot, the Bank has a claim of in excess of $233,000 secured by a lot which has a value of $24,000. Given the current value of the lot, the surrender of the lot to M & I Bank is the potential loss, in the future, of an asset that has little or no value. As to the student loans, the Court has already discussed, in detail, a manner in which the Debtor may make substantial payments to all of her unsecured creditors, including her student loans, and still be able to pay her student loans in full. In short, the Debtor has failed to show any irreparable injury.

## 3. Whether the Issuance of the Stay will Substantially Injure the Other Parties Interested in the Proceeding

The Debtor does not discuss this point in her Motion. The Court could simply stop its analysis there. However, the Trustee argues that the Debtor must post a supersedeas bond to obtain an injunction. Fed.R.Bankr.P. 8005. Since the Court ordered the Debtor to stop the payments of adequate protection to the Bank, as of November 30, 2011, the Trustee argues that the Bank is being injured by the loss of said adequate protection payments. Because there is no evidence in the record that the Scottsdale lot has continued to decline in value after November 30, 2011, there is no basis for this Court to determine that a supersedeas bond should be issued. The Court declines, at this time, to order the posting of a supersedeas bond by the Debtor.

## 4. Where the Public Interest Lies

The Debtor is unclear in her Motion on this point. It appears that she may be

14

arguing that the discriminatory treatment of her general unsecured creditors to allow payment in full of her student loans is an issue of first impression to her, and warrants a stay to allow the appellate courts to rule on the matter. As noted earlier in this decision, the parties previously focused on the applicable case law concerning the discriminatory treatment of one class of creditors over another class of the same priority. The Debtor carried the burden of proof to show that her discriminatory treatment was not unfair. The Debtor failed to present evidence to meet the Wolff factors.

Thus, the Debtor has failed to show that the public interest warrants the issuance of a stay. To the contrary, although the Court did not confirm the Debtor's plan, it also did not dismiss her case. The Court has offered this Debtor yet another opportunity to file and confirm a Chapter 13 plan, even though she filed her Chapter 13 petition in 2009, quite some time ago, even in the District of Arizona, which has a fairly heavy caseload. No stay should issue. The Debtor should file her amended plan as directed.

### III. CONCLUSION

The Court has thoroughly analyzed the issues presented by the Debtor in her Motion for Stay Pending Appeal. For the reasons stated in this decision, the Court must deny her request. The Court will execute a separate order incorporating this decision.

DATED this 21st day of May, 2012.

_____

Honorable Sarah Sharer Curley
United States Bankruptcy Judge

15